# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Case No. 20-cv-06865** |
| **Plaintiff,** | |
| **v.** | **COMPLAINT** |
| **SEPEHR SARSHAR,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against defendant Sepehr Sarshar ("Sarshar") and alleges as follows:

## NATURE OF THE ACTION

1. This matter involves Sarshar—the founder of Auspex Pharmaceuticals, Inc. ("Auspex") and a member of its board of directors during the relevant period—illegally using his access to and possession of Auspex's inside information to enrich his family and friends.

2. On March 30, 2015, Auspex announced that Teva Pharmaceutical Industries Ltd. ("Teva") had commenced a tender offer to acquire Auspex for $101 per share (the "Tender Offer Announcement"), a premium of 42% above Auspex's closing share price on the previous trading day.

3. In the weeks leading up to the Tender Offer Announcement, Sarshar communicated material nonpublic information relating to the tender offer to his family and friends and caused them to trade in Auspex securities.

4.      As a result, Sarshar's family and friends purchased Auspex securities ahead of the Tender Offer Announcement, thereby enriching themselves at the expense of others who were not in Sarshar's inner circle.  In total, Sarshar's family and friends realized illegal profits of at least $300,000.

5.      By engaging in the conduct described in this Complaint, Sarshar violated, and unless enjoined will continue to violate, Section 14(e) of the Securities and Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. § 78u(d), 78u-1] to enjoin acts, transactions, practices, and courses of business, and to obtain civil penalties and such other and further relief as the Court may deem just and appropriate.

7.      The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  Sarshar has, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of business alleged in this Complaint.

8.      Venue lies in this judicial district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Southern District of New York, including that Sarshar communicated material nonpublic information regarding the impending tender offer to at least one individual within this district.

**DEFENDANT**

9.      Sepehr Sarshar, age 53, lives in Cardiff by the Sea, California.  Sarshar was a founder of Auspex, and during the relevant period, was a member of Auspex's board of directors.  He is now a commercial real estate developer.  Sarshar has entered into a tolling agreement which tolled the statute of limitations applicable to this action from February 26, 2020 through August 26, 2020.

**RELEVANT INDIVIDUALS**

10.      Trader A, age 52, lives in Encinitas, California.  She was Sarshar's romantic partner during the relevant period.  Trader A purchased Auspex securities ahead of the Tender Offer Announcement after communicating with Sarshar.

11.      Trader B, age 53, lives in Beverly Hills, California.  He was a longtime friend of Sarshar during the relevant period.  Trader B has been friends with Sarshar since they attended college together in the 1980s.  Trader B purchased Auspex securities ahead of the Tender Offer Announcement after communicating with Sarshar.

12.      Trader C, age 53, lives in Los Angeles, California.  He was a longtime friend of both Sarshar and Trader B during the relevant period.  Trader C has been friends with Trader B since they attended high school together, and with Sarshar since they attended college together, all in the 1980s.  Trader C purchased Auspex securities ahead of the Tender Offer Announcement after communicating with Trader B, who recently had spoken with Sarshar.

13.      Trader D, age 51, lives in Corona Del Mar, California.  He was a friend of Sarshar during the relevant period.  Trader D met Sarshar in the early 2000s, and they surf together.  Trader D purchased Auspex securities ahead of the Tender Offer Announcement after communicating with Sarshar.

14.     Trader E, age 51, lived in New York, New York during the relevant period and now lives in Los Angeles, California.  He is Sarshar's brother.  Trader E purchased Auspex securities ahead of the Tender Offer Announcement after communicating with Sarshar.

15.     Trader F, age 41, lived in New York, New York during the relevant period and now lives in Los Angeles, California.  He is Trader E's husband and was Trader E's domestic partner during the relevant period.  Trader F purchased Auspex securities ahead of the Tender Offer Announcement after communicating with Trader E, who recently had spoken to Sarshar.

## RELEVANT ENTITIES

16.     Auspex Pharmaceuticals, Inc., a biopharmaceutical company focused on drug development, was a Delaware corporation headquartered in La Jolla, California.  Auspex was founded in 2001, and Auspex securities began to be publicly traded in early 2014.  At all relevant times, Auspex's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ under the symbol "ASPX."

17.     Teva Pharmaceutical Industries Ltd., a global pharmaceutical company, is an Israeli corporation headquartered in Petah Tikva, Israel.  At all relevant times, Teva's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange under the symbol "TEVA."

## FACTS

I.    **Sarshar Founded Auspex and Relied on Friends and Family to Financially Support This New Venture**

18.     In 2001, Sarshar founded Auspex, a biopharmaceutical company whose operations were centered on the application of a specific chemical process designed to improve existing medications.

19.     Before the company was publicly traded, Auspex conducted multiple capital raises, from its inception in 2001 through 2014, to fund operations.

20.     Throughout this period, Sarshar solicited his friends and family to invest in Auspex.

21.      Sarshar and his brother, Trader E, created a private equity vehicle called Costa Verde Capital ("Costa Verde") for the purpose of combining the funds provided by Sarshar's family and friends for investment in Auspex.

22.     Sarshar's family and friends who invested in Auspex through Costa Verde include many of the individuals who traded in Auspex ahead of the Tender Offer Announcement, including Trader B, Trader C, Trader D, Trader E, and Trader F.

23.     In 2014, Auspex completed an initial public offering at a price of $12 per share, and its shares began trading on the NASDAQ.

## II.    Starting in January 2015, Auspex, Teva, and Their Executives Undertook Substantial Steps Toward a Tender Offer

24.     Starting in mid-January 2015, Auspex's chief executive officer (CEO) began meeting with senior management of multiple large pharmaceutical companies, including Teva, to discuss potential strategic transactions.

25.     On February 9 and 10, 2015, Auspex's CEO and other members of Auspex's senior management traveled to Israel and met with Teva senior executives regarding a potential acquisition of Auspex by Teva.

26.     On February 16 and 17, 2015, Auspex held a two-day meeting of its board of directors, during which the board discussed possible strategic transactions, including Teva's interest in acquiring Auspex.  Sarshar attended this meeting in person.

27.     During the February 2015 meeting, Auspex's board of directors, including Sarshar, unanimously authorized Auspex's management to retain a specific investment bank ("Investment Bank A") as its investment banker in connection with the proposed strategic transactions.  Auspex subsequently retained Investment Bank A for that purpose.

28.     Throughout this time period, multiple pharmaceutical companies expressed serious interest in a transaction with Auspex, and Auspex took various steps toward a potential transaction with these companies.

29.     On February 24, 2015, Teva submitted a non-binding proposal to Auspex, proposing to acquire Auspex in an all-cash tender offer in which Teva would pay approximately 30% above the then-current market price for Auspex shares.

30.     As a member of Auspex's board of directors, Sarshar was immediately notified of Teva's offer.

31.     Auspex entered into confidentiality agreements and began due diligence with multiple potential acquirers, including with Teva on March 1, 2015.

32.      In early March 2015, Teva continued its due diligence efforts, preparing to make a more detailed offer to acquire Auspex.

33.     On March 17, 2015, Auspex's board of directors held a telephonic meeting to discuss the valuation of the company with Investment Bank A, and to assess the non-binding proposals made by Teva and another company that was interested in acquiring Auspex.  Sarshar attended this meeting by phone.

34.     At this telephonic board meeting, Auspex's board of directors expressed that it was interested in an all-cash tender offer at the upper range of Teva's February 24, 2015 proposal.

6

35.     Negotiations between Auspex and Teva accelerated quickly during the week of March 23, 2015.

36.     On March 23, 2015, Teva provided Auspex with an updated draft merger agreement, and informed Auspex that Teva's board of directors was expeditiously completing its process to review and approve the proposed tender offer.

37.     On Friday, March 27, 2015, Teva submitted a revised final proposal to acquire Auspex in an all-cash tender offer.

38.     On Monday, March 30, 2015, prior to market open, Teva and Auspex jointly announced that Teva would commence an all-cash tender offer for all outstanding shares of Auspex at $101 per share, an approximately 42% premium above Auspex's closing share price on Friday, March 27, 2015.  The tender offer was completed on May 5, 2015.

III.     **Sarshar Knew or Should Have Known That Information Relating to the Tender Offer Was Acquired From Auspex**

39.     Because Sarshar was Auspex's founder and a member of its board of directors, throughout February and March 2015, he was kept apprised of the efforts of Auspex's senior management and Investment Bank A to market Auspex for sale.

40.     Auspex immediately notified Sarshar of Teva's initial non-binding all-cash tender offer made in February 2015.

41.     Sarshar attended board meetings during which the possibility of Auspex agreeing to enter into a tender offer transaction with Teva was discussed.

IV.     **Sarshar Knew or Should Have Known That Information Relating to the Tender Offer Was Nonpublic**

42.     As a member of Auspex's board of directors, Sarshar knew that all board discussions were nonpublic.

43.     Sarshar knew he was subject to Auspex's code of business conduct and ethics, which prohibited using or sharing nonpublic information about Auspex for stock trading purposes or for any other purpose except to conduct Auspex's business.

44.     In February 2014, Sarshar sent an email to those individuals who had invested in Auspex through Costa Verde.  Sarshar explained in the email that, because he was remaining on Auspex's board after Auspex began to be publicly traded, he would not be allowed to communicate with anyone about company matters that were not public knowledge.

45.     Sarshar also understood that information relating to Auspex's potential strategic transactions—including the potential acquisition of Auspex by Teva via tender offer—was nonpublic.

46.     On February 16 and 17, 2015, Sarshar attended an in-person Auspex board meeting, where he participated in what he understood to be nonpublic discussions regarding the potential sale of Auspex.

47.     Sarshar also spoke with Auspex's CEO about the potential transaction throughout the weeks leading up to the Tender Offer Announcement, and understood these conversations were nonpublic.

**V.     Sarshar Communicated Material Nonpublic Information and Caused Trading in Auspex Securities by his Family and Friends Ahead of the Tender Offer Announcement**

      **A.     Sarshar's Then-Girlfriend Traded in Auspex Securities Ahead of the Tender Offer Announcement**

48.      Trader A was in a romantic relationship with Sarshar during the months leading up to the Tender Offer Announcement.

49.      Trader A was not an experienced investor.

50.     On the morning of February 24, 2015, Sarshar learned that Teva submitted a non-binding proposal to acquire Auspex.  Sarshar texted Trader A, and they exchanged text messages for approximately 20 minutes.

51.     Five minutes after texting with Sarshar, Trader A called her employer's 401(k) Plan administrator to inquire how to move funds from her retirement account into a self-directed brokerage account, and discussed this topic for approximately one hour.

52.     About 30 minutes after Trader A's conversation with her employer's 401(k) Plan administrator, she informed Sarshar that she was able to move money to a different account, and told him that she was going to send him a list of her investments and asked him to tell her which she should sell.  Sarshar agreed to do so.

53.     The next day, on February 25, 2015, Auspex's CEO called Sarshar, and they spoke about Investment Bank A and its work advising Auspex's board of directors regarding plans to sell the company.

54.     Immediately after speaking with Auspex's CEO, Sarshar texted Trader A and she responded.  Later that day, Trader A again called her employer's 401(k) Plan administrator, and thereafter continued to exchange text messages with Sarshar.

55.     On the following day, Sarshar, who was travelling internationally, asked Trader A at what price "the stock" closed today, and Trader A responded with that day's closing price of Auspex stock.

56.     On February 27, 2015, Trader A transferred approximately $50,000 from her 401(k) retirement account to a self-directed brokerage account that she simultaneously opened.  Trader A then used almost all of the transferred cash to purchase Auspex shares.  Immediately after placing the trade, she texted Sarshar.

57.     Approximately one month later, during the week of March 23, 2015, Teva was finalizing its offer to purchase Auspex.

58.     On March 25, 2015, Sarshar again contacted Trader A after speaking with Auspex's CEO.

59.     Two minutes after speaking with Sarshar, Trader A purchased additional Auspex shares, spending approximately $5,000.  As the trade was going through, Trader A texted Sarshar, "Just bought 75 shares."

60.     Two days later, on Friday, March 27, 2015, Teva submitted its final proposal to acquire Auspex at $101 per share.  That evening, Sarshar spoke briefly by telephone with Auspex's CEO.

61.     A few minutes after his call with Auspex's CEO concluded, Sarshar asked Trader A to confirm how many total shares she had and how much she had invested.  She answered his questions and then asked why he was asking, to which he responded, "just checking."

62.     After the Tender Offer Announcement, Trader A texted Sarshar to discuss the sale of Auspex.  Knowing that she had profited from the deal, Sarshar asked if she was going to go out and celebrate.

63.     As set forth above, Sarshar caused Trader A to trade in Auspex securities prior to the Tender Offer Announcement.

64.     By trading prior to the Tender Offer Announcement, Trader A realized $28,111 in illicit profits.

**B.      Sarshar's College Friends Traded in Auspex Securities Ahead of the Tender Offer Announcement**

65.      After Sarshar founded Auspex, his longtime friend, Trader B, purchased thousands of Auspex preferred shares through Costa Verde, the private equity group created by

Sarshar and his brother, Trader E.  Sarshar was aware that Trader B had invested in Auspex securities.

66.     Between his early investments through Costa Verde and later purchases after Auspex began to be publicly traded, by the end of January 2015, Trader B owned a total of 75,000 Auspex shares worth approximately $4.5 million.

67.     Like Trader B, Trader C had been friends with Sarshar since they attended college together in the 1980s.

68.      Trader C also invested in Auspex through Costa Verde, and as of January 2015, Trader C owned a total of approximately 8,000 Auspex shares, worth approximately $500,000.

69.     Sarshar had told Costa Verde members that he would remain on Auspex's board of directors after it went public and made clear he would continue to have access to Auspex's nonpublic information.

70.     On the morning of March 11, 2015, Sarshar dialed into a conference call line used by Auspex's board of directors and was on the call for approximately one hour and 45 minutes.

71.     Thereafter on the same day, Sarshar called Trader B.  During this call, Sarshar told Trader B material nonpublic information about the ongoing process to sell Auspex, and told Trader B to absolutely buy more shares.

72.     About an hour and a half later, Trader B called Trader C.

73.     On this call, Trader B relayed to Trader C material nonpublic information about Auspex's plans that Sarshar had told him (Trader B) earlier, including that Sarshar had told him Investment Bank A was working on a potential sale of Auspex and that Sarshar was under the impression that a deal might happen; that Auspex was having its audits done in preparation for a

potential sale; a price per share range at which Sarshar would be willing to approve a sale of Auspex; and that he (Trader B) absolutely should buy more Auspex shares.

74.     At the time that Trader B relayed to Trader C what Sarshar had told him (Trader B), Investment Bank A had been advising Auspex's board of directors on a potential sale of Auspex.  Since mid-February, Auspex had been doing quality control audits as part of Teva's due diligence process, and the per share price point identified by Sarshar was within the range of that under discussion by Investment Bank A, Auspex's management, and Auspex's board.

75.     The day after his conversation with Trader B, on March 12, 2015, Trader C purchased additional Auspex shares, and continued to purchase Auspex shares daily through Monday, March 16.  Trader C purchased a total of 1,100 shares for approximately $86,000.

76.      Trader B also bought additional Auspex shares in the week before the Announcement, purchasing additional shares on March 24, 26, and 27, 2015.

77.     Trader B and Trader C also sold Auspex shares between March 20 and 25, 2020, in part to finance a short position in a different pharmaceutical company.  Notwithstanding such sales, both Trader B and Trader C maintained significant Auspex holdings and were positioned to—and did—profit as a result of the Tender Offer Announcement.

78.     As forth above, Sarshar communicated material nonpublic information to Trader B under circumstances in which it was reasonably foreseeable that such communication was likely to result in trading of Auspex securities and caused Trader B and Trader C to purchase Auspex securities prior to the Tender Offer Announcement.

C.     **Sarshar's Surfing Friend Traded in Auspex Securities**

79.     During the relevant period, Trader D and Sarshar had been friends for over a decade.  Like Sarshar, Trader D was a surfer, and the two often surfed together.

80.     Like Trader B and Trader C, Trader D had participated in the early equity raises for Auspex by investing through the Costa Verde vehicle.  By January 2015, Trader D held over 16,000 Auspex shares in a personal brokerage account, worth approximately $1 million.  Sarshar was aware that Trader D had invested in Auspex securities.

81.     Sarshar had told Costa Verde members that he would remain on Auspex's board of directors after it went public and made clear he would continue to have access to Auspex's nonpublic information.

82.     On Friday, March 6, 2015, Trader D called Sarshar, and they spoke on the telephone for approximately one hour and 15 minutes.  By the time the call ended, the market had closed for the day.

83.     On the following Monday morning, March 9, 2015, Trader D purchased 448 shares of Auspex stock in his brokerage account.

84.     The next day, March 10, 2015, Trader D purchased an additional 55 Auspex shares in the same account, and also sold $200,000 worth of mutual fund shares in two retirement accounts.

85.     On the following day, March 11, 2015, Trader D purchased a total of 2,285 Auspex shares in three accounts, spending over $165,000, including over $100,000 in the two retirement accounts in which he had sold the mutual funds the day before.

86.     On March 12, 13, 16, 20, and 23, Trader D purchased another 1,421 Auspex shares in his retirement accounts, using the remaining $100,000 in proceeds from his earlier sale of mutual funds.

87.     Additionally, on March 11, 2015, Trader D recommended to his cousin that he also purchase Auspex shares.  His cousin purchased a total of 234 shares of Auspex on March 11, 18, and 19 based on Trader D's recommendation.

88.     As set forth above, Sarshar communicated material nonpublic information to Trader D under circumstances in which it was reasonably foreseeable that such communication was likely to result in trading of Auspex securities and caused Trader D to purchase Auspex securities prior to the Tender Offer Announcement.

**D.     Sarshar's Brother and Brother-in-Law Traded in Auspex Securities**

89.     Sarshar's brother, Trader E, was another early investor in Auspex, and ran operations for the Costa Verde investment vehicle used for Auspex's early capital raises.  By early 2015, Trader E had accumulated more than 6,300 Auspex shares, worth almost $400,000, and his then-domestic partner (now husband), Trader F, held over 800 Auspex shares, worth approximately $50,000.  Sarshar was aware that Trader E and Trader F had invested in Auspex securities.

90.     Sarshar had told Costa Verde members that he would remain on Auspex's board of directors after it went public and made clear he would continue to have access to Auspex's nonpublic information.

91.      Trader E and Sarshar spoke often throughout the months leading up to the Tender Offer Announcement.

92.     On February 16 and 17, 2015, Sarshar attended a two-day, in-person Auspex board of directors meeting.  On the first day, the board discussed the possibility of selling Auspex to a number of potential acquirers, including Teva.

93.     Just prior to the beginning of the second day of the board meeting, Sarshar called Trader E and they spoke for one minute.  Minutes later, Trader E purchased 4,300 Auspex shares at a cost of almost $300,000.

94.     On the following day, February 18, 2015, Trader E loaned $50,000 to his domestic partner, Trader F, executing a promissory note reflecting the loan.

95.     On the same day the note was executed, Trader F used the entire $50,000 to purchase 701 Auspex shares, and no other securities.

96.     On March 4, 2015, Trader E spoke with Sarshar on the telephone.  Minutes later, Trader E called his domestic partner, Trader F.

97.     On the following day, March 5, 2015, Trader F deposited approximately $9,000 in his brokerage account and used those funds to purchase an additional 144 Auspex shares.

98.     A few weeks later, on March 25, 2015, Trader E purchased an additional 4,900 Auspex shares.  Less than half an hour after Trader E's purchase, Trader F also purchased an additional 76 Auspex shares.

99.     As set forth above, Sarshar communicated material nonpublic information to Trader E under circumstances in which it was reasonably foreseeable that such communication was likely to result in trading of Auspex securities and caused Trader E and Trader F to purchase Auspex securities prior to the Tender Offer Announcement.

## VI.     Auspex and Teva Announced the Tender Offer

100.    On Monday, March 30, 2015, prior to market open, Teva and Auspex jointly announced that Teva would commence a tender offer for all outstanding shares of Auspex at $101 per share in cash, which was 42% higher than Auspex's closing price per share the previous Friday.

101.    On May 5, 2015, the tender offer was completed, and Teva purchased all outstanding Auspex shares.

102.    Because Sarshar illegally used his access to and possession of material nonpublic information regarding the tender offer to enable his friends and family to trade in Auspex shares before the Tender Offer Announcement, Sarshar's friends and family realized at least $300,000 in ill-gotten gains.

**VII.    Sarshar Attempted to Conceal his Misconduct**

103.    On August 13, 2015, the Financial Industry Regulatory Authority (FINRA) sent Auspex a standard identification letter in connection with its review of suspicious trading in Auspex securities ahead of the Tender Offer Announcement (the "FINRA Letter").

104.    The FINRA Letter identified Sarshar's college friend, Trader B, his surfing friend, Trader D, his brother, Trader E, and his brother-in-law, Trader F, as traders of interest.

105.    When asked to provide a summary of contacts with these individuals from February 2, 2015 through March 27, 2015, Sarshar responded that he had had no contact with any of them except his brother, Trader E.

106.    Sarshar's response was false.

107.    In fact, Sarshar had spoken on the telephone at least nine times and exchanged over 80 text messages with Trader B and Trader D during the two-month window leading up to the Tender Offer Announcement, and had communicated with Trader B every week or so throughout 2014 and 2015.

108.    When asked for any circumstances under which Trader B, Trader D, Trader E, or Trader F could have gained any knowledge of Auspex's confidential business activities, Sarshar falsely stated that there were none.

## VIII.     Sarshar Violated the Securities Laws

109.     Sarshar was a director of Auspex, an issuer of securities sought by tender offer in the weeks preceding the Tender Offer Announcement.

110.     All of Sarshar's communications of material nonpublic information and all of the trading at issue, as described above, occurred after a "substantial step" had been taken towards a tender offer, including but not limited to: multiple discussions between Auspex's and Teva's officials regarding potential transaction structures, two days of in-person meetings in Israel with Auspex's senior management and Teva executives regarding a potential transaction, a two-day meeting of Auspex's board of directors to discuss potential transactions, Auspex's retention of Investment Bank A to facilitate selling the company, and Teva's submission of an acquisition proposal.

111.     Sarshar caused the trading of Trader A, Trader B, Trader C, Trader D, Trader E, and Trader F in Auspex securities ahead of the Tender Offer Announcement.

112.     Sarshar communicated material nonpublic information relating to a tender offer to Trader B, Trader D, and Trader E under circumstances in which it was reasonably foreseeable that such communication was likely to result in trading in Auspex securities ahead of the Tender Offer Announcement.

113.     Sarshar knew or had reason to know that information relating to the tender offer was acquired from Auspex because he acquired this information directly in his role as an Auspex director, the issuer of the securities sought by the tender offer.

114.     Sarshar knew or had reason to know that information relating to the tender offer was nonpublic.

17

115.    The information relating to the tender offer that Sarshar communicated was material because there is a substantial likelihood that a reasonable investor would consider the information important in deciding to purchase or sell a given security.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 14(e) and Rule 14e-3 Thereunder

116.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 115.

117.    Sarshar obtained material nonpublic information from Auspex, the company he founded and on whose board of directors he was a member, regarding the impending tender offer by Teva.

118.    Sarshar knew or had reason to know that he had obtained this information directly from Auspex.

119.    Sarshar knew or had reason to know that the information regarding the impending tender offer was nonpublic.

120.    After substantial steps had been taken to commence a tender offer for Auspex's shares and before the tender offer had been publicly announced, Sarshar communicated material nonpublic information to family and friends under circumstances in which it was reasonably foreseeable that such communication was likely to result in their purchase or sale of Auspex's securities before the tender offer was publicly announced, and caused Auspex's securities to be purchased before the tender offer was publicly announced.

121.    By reason of the foregoing, Sarshar directly or indirectly violated and, unless enjoined will again violate, Exchange Act Section 14(e) [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

A.      Permanently restraining and enjoining Sarshar from violating Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

B.      Ordering Sarshar to pay a civil penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

C.      Retaining jurisdiction of this action for purposes of enforcing any final judgment and orders; and

D.      Granting such other and further relief as this Court may deem just and appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

Dated:       August 25, 2020                    Respectfully submitted,


                                                S/ Mark R. Sylvester
                                                Mark R. Sylvester
                                                Securities and Exchange Commission
                                                200 Vesey Street, Suite 400
                                                New York, NY 10281
                                                (212) 336-0159 (telephone)
                                                (301) 623-1193 (facsimile)
                                                sylvesterm@sec.gov

                                                Kelly L. Gibson
                                                Jennifer Chun Barry
                                                Scott A. Thompson
                                                Megan Ryan
                                                Securities and Exchange Commission
                                                1617 JFK Blvd., Suite 520
                                                Philadelphia, Pennsylvania  19103
                                                (215) 597-3100 (telephone)
                                                (215) 597-2740 (facsimile)
                                                gibsonkl@sec.gov
                                                barryj@sec.gov
                                                thompsons@sec.gov
                                                ryanme@sec.gov

                                                *Attorneys for Plaintiff*
                                                *Securities and Exchange Commission*